UNITED STATES v. NUNEZ et al.

(Circuit Court, S. D. New York. November 19, 1896.)

NEUTRALITY LAWS—MILITARY EXPEDITION AIDING CUBAN INSURGENTS—REV. ST. § 5286.

> The transportation of goods for commercial purposes only and the carriage of persons separately, though their individual design may be to enlist in a foreign strife, are not prohibited by our law if the transportation is without any features of a military character. Indications of a military operation or of a military expedition are concert and unity of action, organization of men to act together, the presence of weapons, and some form of command or leadership. When these exist and are known to the persons engaged in the transportation, all who knowingly aid in such transportation for military purposes are liable under section 5286, Rev. St.

Indictment for breach of section 5286, Rev. St. U. S., for setting on foot or providing the means for a military enterprise against Spain. and fitting out the steamship Laurada from the city of New York in aid of Cuban insurgents in May, 1896.

The vessel left Philadelphia on the 8th day of May. She had several boats in her hold, and one on deck. She arrived in the city of New York on the Saturday following; cleared at the custom house the same afternoon for Port Antonio, upon a manifest stating a few chairs and tables as cargo, and sailed for Montauk Point at the east end of Long Island. The same night two lighters were loaded with arms, ammunition and men at pier 39 East river and at Astoria in the East river, and were thence towed to Montauk Point, where the men and arms were transferred to the Laurada, which then proceeded directly to Cuba, where the men and arms were secretly landed. On the voyage the boxes of arms were opened, and the men were supplied with arms and drilled. Gen. Ruiz went on board the Laurada in the harbor of New York in company with the defendant Nunez, and continued on board and was landed with the expedition in Cuba. Nunez left the Laurada at Montauk Point and returned to this port by one of the tugs that had towed down the lighters. At Montauk Point, where the men and arms were transferred to the Laurada, her firemen and crew struck and refused to work. The tug containing Nunez was called back and the captain of the Laurada reported to him their refusal to proceed without further pay "if the expedition meant Cuba"; whereupon $100 was given to the captain for them, either by Nunez or a companion, upon which the Laurada proceeded. Nunez afterwards proceeded to Charleston where he was awaiting the return of the Laurada from Cuba.

Wallace Macfarlane and Jason Hinman, for the United States.
Gen. Tracy, for defendants.

BROWN, District Judge (after stating the facts as above).   As has been rightly stated to you, gentlemen, by counsel, this is a case of more than usual interest and importance; because it not only affects as has been said the individual defendants and their relations perhaps to a few persons, but it involves also indirectly international relations. The series of laws or enactments of which the statute under which this indictment is framed is one, known usually as the "Neutrality Laws," were enacted long since, and substantially in the same form in which they exist to-day, during the administration of Washington in 1794. These enactments pretty much covered what it was considered necessary to provide in order to prevent entanglements between this government and foreign powers, by prohibiting expeditions from this country interfering with belligerents, or with the relations between a mother

country and its insurgent people, in such a way as to entangle us, and become justly a subject of contention, and in that way, if not checked, liable to lead us into serious complications. For that purpose the statute of 1794, embracing a number of different provisions, was passed to endeavor to check the various forms in which these evils might arise. I have regarded it from the first as of some consequence to look to that statute as a whole, because what it prohibited, as well as what it did not prohibit, was such as to throw some light upon the different parts of the statute, and show what was intended. This will aid in the interpretation, inasmuch as in the section under which this indictment is drawn, there is such generality of language as to lead to some difficulty or perplexity in its application to particular cases. This observation upon the statute is not my own. It was made by Chief Justice Marshall only a few years after this statute was passed, when he said that there was in this section "a lack of precision in defining the offense, which might hereafter lead to difficulty in its application." It is for that reason that I ask your attention for a few moments to the different provisions of the law, that you may understand more clearly the differences between what is lawful, and what is unlawful within our statute. I should say that there have been one or two minor amendments to this statute since it was passed; but they are of quite a minor character, and in no way affect this prosecution. The old law has been embodied in the provisions of the Revised Statutes, adopted in 1874, and is now referred to in different sections of the Revised Statutes.

Section 5282 deals with the enlistment of individuals. Section 5286, under which this indictment is framed, deals with military expeditions or enterprises. Section 5283 deals with armed cruisers, designed to commit hostilities in favor of one foreign power as against another. The section which deals with the enlistment of individuals, section 5282, prohibits any person from enlisting in this country as a soldier in the service of a foreign power. It also prohibits any person from hiring or retaining any other person to enlist or to go abroad for the purpose of enlisting; but it does not prohibit any person, whether he is a citizen or not, from going abroad himself for the purpose of enlisting in a foreign state or foreign army.

By our legislation, therefore, on this subject, it is evident from this statute, and from what is prohibited and what is not, that individuals are permitted to go abroad to foreign countries to enlist, when they do so voluntarily and without being induced by other persons, or without hiring, and there is no enlistment in this country. So there is nothing in this statute which prohibits a commercial enterprise. The transportation of goods in a commercial way, whether it be contraband of war or not, is not prohibited by the fact that other nations are at war, or that a colony is in a state of insurrection against the parent country. As there is no prohibition against persons going individually to enlist in foreign armies, so it is competent for them, as a necessary incident to this right, to go in company with one another, one or a dozen or a hundred, and in any way they see fit, so long as they do not infringe the only provision bearing upon that subject, namely, that they do not constitute any military expedition or

enterprise. It is the same with the transportation of goods. So long as it is a commercial transaction, so long as it is a peaceable transportation by a vessel either of goods or of men, and is without any features of a military character, such as would constitute it a military enterprise or expedition, our statutes do not prohibit it.

The first question, then, which you have to consider, is whether there was in this case a military expedition or not; whether the facts proved before you show that there was what should be properly termed a military enterprise. The indictment is either for beginning or setting on foot a military enterprise or for providing the means for it. If you do not find there was any military enterprise at all, of course that ends the case.

What constitutes a military enterprise? What are some of the features that mark a military enterprise or expedition as distinguished from a peaceable transportation of passengers, arms, ammunition, or goods? The essential features of military operations are evident enough. They are concert of action, unity of action, by a body organized and acting together, acting by means of weapons of some kind, acting under command, leadership. These are the three most essential elements of military action. On this subject I will read a few passages from the recent case of The Horsa [16 Sup. Ct. 1134], which was before the supreme court, in which this subject is touched on in three or four paragraphs. Chief Justice Fuller in referring to this point says as follows:

"The definitions of the lexicographers substantially agree that a military expedition is a journey or voyage by a company or body of persons, having the position or character of soldiers, for a specific warlike purpose: also the body and its outfit; and that a military enterprise is a martial undertaking, involving the idea of a bold, arduous and hazardous attempt. The word 'enterprise' is somewhat broader than the word 'expedition'; and although the words are synonymously used, it would seem that under the rule that its every word should be presumed to have force and effect, the word 'enterprise' was employed to give a slightly wider scope to the statute."

In quoting from the opinion of the court below in approval, the court say:

"If the persons referred to had combined and organized in this country to go to Cuba and there make war on the government, and intended when they reached Cuba to join the insurgent army and thus enlist in its service, and the arms were taken along for their use, that would constitute a military expedition, and the transporting of such a body from this country for such a purpose would be an offense against the statute."

Again the court say in approval:

"Any combination of men organized here to go to Cuba to make war upon its government, provided with arms and ammunition, we being at peace with Cuba, constitutes a military expedition. It is not necessary that the men shall be drilled, put in uniform, or prepared for efficient service, nor that they shall have been organized as or according to the tactics or rules which relate to what is known as infantry, artillery or cavalry. It is sufficient that they shall have combined and organized here to go there and make war on a foreign government, and to have provided themselves with the means of doing so."

And once more:

"If they intended to stand together and defend themselves, if necessary, the jury had a right, under the circumstances stated, to find that this was a military expedition or enterprise under the statute."

Under these rulings and definitions of the supreme court, I must instruct you that if you find upon the evidence that this body of men, when they landed in Cuba, landed with arms in their hands, which had been provided for their use; that they were then organized together in such a way that they should stand by each other and fight their way if necessary, and defend themselves, or make attack, as the case might be, that would be in fact a military descent upon the Island of Cuba, and the organization or combination would be a military combination —a military enterprise. If you do not find from the evidence that state of things existed, then you will dismiss this case; for if a military expedition is not shown to have existed at that time, it certainly did not exist before. If you do find that the character of that landing was military in its form and substance—namely, a body of men combined and organized, intending to stand by each other for attack or defense, and having arms in their hands for that purpose when they landed—then you find a military expedition at that time; and the question will then remain for you to determine if that was the expedition intended when they left the harbor of New York; and, if so, whether these defendants, or either of them, were privy to it, or provided the means for it.

I shall refrain from commenting to any extent upon the evidence, as it is so freshly before you, and has been commented upon so fully by both counsel. I have already said that the transportation of arms and the transportation of men may be perfectly lawful. By way of illustration I will say further that, for aught I can perceive, if this same association or group of individuals had been taken by the Laurada to the coast of Cuba, to the very spot where they landed, and they had been put ashore in these same boats, and these boxes containing ammunition and other military implements had not been opened or distributed, but had been landed like merchandise,—for aught I can see, that would have been purely a nonmilitary landing, and there would have been no military enterprise. It would have been a case of smuggling; the endeavor to smuggle arms and ammunition for the help of the Cubans in Cuba; and the endeavor of individuals to go there secretly and join the Cuban army, both of which are perfectly lawful, so far as this country is concerned. Those who engage in it take the risk of the Spanish authorities, that is all.

Now, what are you to infer from all the other evidence in the case as to the nature of this expedition when the Laurada left New York? The charge is that the defendants in the Southern district of New York began or set on foot or provided the means for a military expedition. If you find that this was a military expedition when it landed in Cuba, do you find that it was so within the knowledge of the captain (taking him first) when the Laurada left New York? In an indictment of this kind it is a necessary averment that the offense took place in some district, and that must be proved as stated in the indictment. Here it is alleged to have been done in New York. If this landing, in the form described, was not the undertaking that existed when the Laurada left New York, or if the captain did not know of it, he is not liable. But in order to constitute an unlawful expedition "to be carried on from this country,"—for that is the language of the statute—and to be

carried on from the city of New York, it is not necessary that every-thing shall be complete when it leaves this district. The statute says: "Every one who shall begin or set on foot" such an expedition. There-fore, by way of illustration again, if a person takes part in collecting a body of men, and in collecting arms and equipment with the intent that those shall be combined afterwards so as to form a complete ex-pedition, I must say to you that that is a beginning or setting on foot of the expedition which is planned from the first and which is after-wards completed. Such an enterprise falls within the statute. It is an enterprise which would be begun and set on foot here, provided the first important steps were taken here, with the intent to have it completed afterwards, and it was completed in accordance with that intent. If then, when this vessel sailed from New York, there was no intention to make an armed descent upon Cuba, but a mere peaceable transportation of merchandise, of munitions of war, and the peaceable transportation of men as individuals, without any military form or military force at Cuba, then there is no case: the subject-matter, the unlawful expedition, has not arisen. But if these men were collected together here, and were forwarded in the ways you have heard alleged, and if the munitions of war and war material were collected together here with the intent to have them combined, and to form a military descent upon the Island of Cuba, then that enterprise, that undertak-ing, was begun here.

If you find that was the case, then you will next inquire whether either of these defendants were concerned in beginning or setting this expedition on foot, or whether either of them provided the means for it, in this district. As to the commencement or beginning or setting on foot of whatever was done, the testimony is not very complete. The expedition, you will observe, is not the vessel; the vessel is a mere means of transportation. The vessel was not a war vessel; it is very evident that the vessel contemplated no fighting. She was only a means of transportation. But the persons who furnished the vessel at New York, and who started her from New York, in pursuance of a plan to transport an expedition that was intended from the start to be a military expedition, would be providing the means for that ex-pedition; and whoever furnished the vessel, knowing that intent, would be liable under this statute, as providing the means for the enter-prise. If the captain, therefore, as the master of the ship, understood that this expedition was to be a military descent upon the Island of Cuba, or, to put it in another way, that the men were to be landed in a body armed and drilled, ready to stand by each other and to defend themselves, if he understood that when he left this city, he is guilty. If he understood nothing of that, or if you are not satisfied beyond a reasonable doubt that he must have understood that, then whatever else there may be in the case, it would be your duty to acquit him.

It is true, as has been urged by counsel, that matters of precau-tion or secrecy, irregular modes of transportation, are consistent with a peaceable transportation of contraband of war. In any case, the hazards of loss are so great that the only prudent course for persons who are engaging even in a perfectly lawful enterprise of that kind, would be to make their proceedings as secret as possible.

It is, however, equally consistent with an unlawful purpose. If the purpose was a military descent, there is the same necessity for secrecy, and the same result in that respect would follow.

Now in regard to the captain. There are very strong circumstances to show that this voyage was not intended to be simply a voyage to Port Antonio. So much, it is plain, he must have understood. He took on extra boats in the Delaware river. They could be used, it is true, for the landing of the cargo at Cuba, for the Cuban army, in a perfectly legitimate and lawful manner. That circumstance is not of itself indicative of guilt, or even of an unlawful expedition. It is precisely what would be done for the smuggling of these goods into Cuba, if it was a smuggling expedition that the captain intended; or if it was the landing of individuals merely for the Cuban army. To elude the Spanish vessels, it was necessary as much for the lawful enterprise as it would be for the unlawful. You will understand gentlemen, that I am speaking of lawful in reference to this country. So, in going to Montauk Point. If the captain were directed to go to Montauk Point and there await orders, or to wait for cargo to be landed on the Cuban coast, he would understand that his voyage was not for Port Antonio direct, but that he was to be engaged in some kind of irregular transportation for Cuba. He may not have known for what destination, but when he left New York it was plain that he must have known, as I should infer—and these matters, gentlemen, are all for you; what I observe on matters of fact you are to give no weight to except as they commend themselves to your judgment—but when he went to Montauk Point, away from his course towards Port Antonio, he knew that something else was to take place. Ordinarily, it is reasonable to suppose that persons intend what happens under their administration. The captain is the master of the ship. What is done on board the ship, if it is a matter that would naturally attract attention, or would come to the attention of the officers of the ship and be reported to him, it is fair to assume must be known to him. There is no evidence from the several witnesses who have come here from the ship tending to show that there was any objection on the part of the master, or of anybody else belonging to the ship, when these cases were opened and the arms distributed. If there had been evidence of that kind, that would have tended to show that there was a surprise to the master; something different from what he anticipated. The absence of such testimony, while it is not conclusive, is a circumstance which you take into account.

The captain in civil matters is held answerable for what takes place upon his ship. He is supposed to know what takes place, and to accede to what takes place, unless the contrary appears; because he is the supreme commander. If from what there is before you, you consider that there is no reasonable doubt but that the master acquiesced in what has been described and made no objection to it, you will be authorized to find that he understood that what was done was expected to be done, certainly, when he left Montauk Point. Up to Montauk Point, however, there had been three persons come

on the ship with him; the defendant Nunez for one, Dr. Castilio for another—

Mr. Macfarlane: He was on the tugboat. Captain Morton went, according to the testimony.

The Court: Yes, it was he, Captain Morton. There is no evidence here as to when Captain Dickman received his instructions on any of these subjects. We only know he left New York harbor with these two gentlemen, civilians, on board, who went with him to Montauk Point, and remained there until these arms and men were shipped on board and then left, and then he pursued his voyage, and you have the armed landing on Cuba.

A defendant is entitled to all reasonable presumptions in his favor. In order to convict, you must find in your own minds beyond a reasonable doubt, that the defendant Dickman knew the purpose of this expedition, and that it was intended to be a military descent upon Cuba. It is for you to draw your inference on that subject from all the circumstances before you. The court cannot aid you, and must not attempt to take your place. If you are satisfied beyond reasonable doubt that the captain understood in substance that it was intended that that should be done which was afterward accomplished —if he understood that when he left the harbor of New York—then it is your duty to convict him. It is not necessary that he should have understood every detail, but it is necessary that he should have understood sufficient of the facts to show that an expedition of an unlawful character was planned, and that he was expected to carry it out by furnishing transportation for it. If you are satisfied of that, then it is your duty to convict. If you are not satisfied of that beyond reasonable doubt, it is your duty to acquit him.

In regard to the defendant Nunez, there is no evidence to show that he had any part in the collection of the men, in the purchase of the arms, in the hiring of the tugs, in the ownership of the vessel or the chartering of the vessel, if she was chartered; and, so far as I recollect, no evidence that he had done anything to promote this expedition until the arrival at Montauk Point, where he had gone on board.

Mr. Hinman: Where he was on board. He went on board in New York.

The Court: Yes, he went on board in New York. The statute in this case does not include the words "aiding and abetting" expressly. What is prohibited is to begin or set on foot such an enterprise. I do not perceive anything (and if I am in error about this, I will ask counsel to correct me) tending to show that the defendant Nunez did anything in regard to this expedition, either as regards the men or the vessel or the arms within this district—any direct evidence, I mean—towards setting it on foot or beginning it. The rest of the statute is against providing or preparing the means for it. If the defendant Nunez did either of these things in the city of New York, then it is your duty to convict him, if you find that this was a military enterprise. Unless you find he did some one of those four things, it is your duty to acquit him; that is to say, took some part in beginning or setting on foot this expedition, or else providing or preparing the means for it within this district.

I said there was no direct evidence of any act of his done here. The reliance of the government, as I understand, is upon the indirect evidence, which they claim warrants your conclusion that he was the manager of the expedition. To illustrate once more. If the defendant, Nunez, was a mere passenger on board the Laurada when she went down to Montauk Point, and there at the captain's request gave him $100 to satisfy the requirements of the crew, if that was all that Nunez had to do with this enterprise and had nothing to do with it in fathering it before that, that act was not done within this district, and he is not liable for that. So in regard to what happened in Jacksonville harbor or at Mayport. But if he did go there, and if he went to Mayport or Jacksonville to be on the watch for the Laurada when she should have finished her work in Cuba and returned to Jacksonville according to appointment, and met her there in order to give her further instructions; if that was part of a prearranged plan, or if the evidence that has been given here warrants, in your judgment, your finding that, then that would point very strongly to show a connection with the enterprise as a principal; and that, as I understand, is the contention of the government. Not that those single acts, not that the payment of $100 at Montauk Point, makes him liable for that act, nor the order or request that the ship should go to Charleston, if he did give it; but that these things, if you credit the evidence that they were done in the way the government contends for, indicate so strongly the relation of Nunez to this enterprise that you are warranted in finding that he was the manager of it from the start; and that therefore he was concerned in setting it on foot in the harbor of New York. The fact that nobody else is shown to have very much connection with it cannot weigh much with you in finding that it was Nunez. It is only upon affirmative evidence, that is to say, direct evidence, and the circumstances, and such inferences as may be rightly and reasonably drawn from such evidence, that you can convict in a criminal case.

The evidence, as I said a few moments ago, of who it was that set on foot this expedition and managed it here, is very meager. There is some direct evidence in relation to Dr. Castilio and Mr. Espin and General Ruiz—some direct evidence of their action here, but none as regards the action of Nunez here in fitting out the expedition.

Mr. Macfarlane: If your honor will permit me, I would like to call your attention to the fact that the evidence shows that Colonel Nunez went with General Ruiz on the Laurada. General Ruiz was one of the men who went on board the steamer here.

The Court: Yes; I know. He went on board the Laurada.

Now, gentlemen, it is for you to say whether you are satisfied, as reasonable men, and beyond reasonable question, from the circumstances of this case, that Mr. Nunez was engaged in setting on foot this expedition; that he was engaged in planning it here, and planned to make it such a military expedition as was landed in Cuba. If you are satisfied of that beyond reasonable doubt, it is your duty to convict him; otherwise not.

Some other observations will be necessary in commenting upon the various requests to charge that have been made, and I will take them

up seriatim. Many of these, I think, I have covered already; but, per-
haps, it will be shorter for me to read them.

Defendants' counsel have asked me to charge as follows:

"To constitute a military expedition, within the meaning of our statute, it
must be proved in this case beyond a reasonable doubt that a body or com-
pany of men combined and organized in this country to go to Cuba and make
war on the Spanish government, that the arms supplied them were supplied
for that purpose, and that they were acting under some leadership for that pur-
pose."

I charge that must appear, or else that the beginning of such an or-
ganization was started in this country with the intent to complete it
so as to make a military descent upon the Island of Cuba; one or the
other.

I further charge you, as requested:

"That it is entirely lawful for a number of men to leave this country, with
the intent to go to Cuba and there join the Cuban army and fight against the
Spanish government, and that the transportation of such a body of men,
knowing their intention, does not constitute the aiding or abetting or setting
on foot of a military expedition or enterprise, and is not an offense within the
meaning of our statute.

"It is entirely lawful for an American citizen, or any other person residing
in the United States, to sell and ship arms to the Cuban army in Cuba, or to
sell to the agents of the insurgents in this country, with a view to their being
shipped to the insurgents in Cuba, there to be used against the Spanish govern-
ment, and that such act is not unlawful, even although it is done with the in-
tent thereby to aid and assist the insurrection in Cuba."

I charge you that.

The fact that the men are transported and the arms and ammunition
carried in boxes as merchandise upon the same ship, does not of itself
constitute a military enterprise or expedition within the meaning of
our statute.

And I add to that that the intent of the men to enlist after they get
to Cuba does not make an expedition, which is otherwise lawful, un-
lawful.

I further charge you as requested, that if you find the expedition as
fitted out was an unlawful expedition or enterprise, but that no knowl-
edge of the facts which constituted it an unlawful expedition or enter-
prise came to Captain Dickman's knowledge until after he left the port
of New York, he must be acquitted.

Also, that to convict the captain of the ship you must find from the
evidence, not only that the enterprise was an unlawful one within the
meaning of the statute, but that the captain had in New York knowl-
edge of sufficient facts to show that an unlawful enterprise or expedi-
tion was contemplated.

Even should the jury find that the captain, before he left New York,
knew that he was to transport from off Montauk Point on the Laurada
a number of men and a cargo of arms and ammunition, that alone is
not enough of itself to convict him. The jury must also find that
before leaving this district he had reason to believe that the men and
arms were to be so combined on the way to Cuba as to constitute a mili-
tary expedition, within the meaning of the statute.

I also charge you that it was entirely lawful for the captain to en-

gage in the secret transportation of arms and ammunition intended for the Cuban service in Cuba, in a commercial and nonmilitary way, and that any step taken by him to conceal from the Spanish man of war, or the agents of the Spanish government, the fact that he was about to engage in such an enterprise, is as consistent with a lawful purpose as it is with an unlawful purpose, and therefore is not of itself any certain evidence of guilt against the captain of the ship.

Inasmuch as the transportation of passengers and merchandise in a perfectly lawful way would be accompanied with danger, therefore it would be only the part of prudence in those who would wish to conduct a perfectly lawful enterprise to be cautious, careful, and to take all the means of secrecy possible to prevent the anticipation and thwarting of the enterprise.

I charge you that the mere fact of secrecy or mystery that might hover around such enterprises as have been described does not of itself give it an unlawful character.

In regard to Nunez I also charge, as requested, that the presence of Nunez on board the Laurada off Montauk Point and his visit to that vessel off Jacksonville are not in themselves alone sufficient to prove that he began, set on foot, prepared or provided the means for a military expedition or enterprise.

"To convict Nunez you must find, beyond a reasonable doubt, that before leaving the Southern district of New York he either began, set on foot, prepared or provided the means for a military expedition or enterprise, or took part in some one of those things."

"Even if you find that Nunez, within the Southern district of New York, had knowledge that the Laurada was going to carry men, arms and ammunition to Cuba, you must acquit him, unless you also find that he did some act towards beginning, setting on foot, preparing and providing the means for a military expedition or enterprise."

"Even if Nunez knew that arms and ammunition would be carried on board the Laurada, you must acquit him, unless it is proved beyond a reasonable doubt that he knew within the Southern district of New York, that these men and arms would be so combined as to constitute a military enterprise."

Instead of "knew" I should say "had reason to believe and intended, within the Southern district of New York, that these men and arms would be so combined as to constitute a military enterprise; and that he did some act towards beginning, setting on foot, preparing or providing the means for a military expedition or enterprise."

Finally, I charge as requested, that if the jury find that all the evidence and circumstances relied on to show guilt, taken altogether, are as compatible with the theory of innocence, or with the theory of an innocent undertaking, as with the theory of a prohibited undertaking, it is their duty to find the defendant not guilty; for that would constitute a situation of reasonable doubt, the benefit of which must be given to the defendant.

I am requested by the government to charge that if the jury believe that the arms were opened on the ship, and the men armed before landing, and drilled during the voyage, and landed with the arms in the manner testified to, then the expedition or enterprise was military. I

state that the jury would be authorized to find from these facts that it was a military expedition.

I am requested to charge you also by the government that if the captain knew when he left New York that he was going to take in his ship a body of men and a quantity of arms, which the men intended from the start to use in warlike operations against Spain, in Cuba, he is guilty.

I shall need to qualify that. I shall say that if the captain knew when he left New York that he was going to take in his ship a body of men and·a quantity of arms, which the men intended from the start to use in making a hostile landing or a military landing in the sense I have stated, he would be guilty. I qualify that, because the men might have intended to use them only after they had enlisted in the army.

How about the third request; do you want me to charge that?

Mr. Macfarlane: I withdraw the third request. I ask your honor to call the attention of the jury to this, that in determining the guilty intention of these defendants in leaving this jurisdiction they must consider all the evidence of what happened afterwards.

The Court: That is right.

Mr. Macfarlane: And if they believe that the defendants in leaving this district had the intention to do those things in furtherance of this project, then they are warranted in finding him guilty of the offense charged.

The Court: Yes. I intended, gentlemen, to say to you also that in all such cases the commission of such an offense is almost never to be proved by a single piece of evidence or a single witness. You judge from the testimony all together, piece by piece, part by part, one thing that fits into another; and in judging the motives and intentions, and knowledge particularly, it is impossible to judge otherwise than from the circumstances; the history of events as they succeed each other. You judge of it, therefore, as a whole, and you take the testimony together as each part bears upon the other, so far as you credit it, and from these elements you draw your conclusion.

Mr. Tracy: I ask your honor to charge the jury that in order to convict the captain they must be satisfied from the evidence introduced on the trial beyond a reasonable doubt that he knew before he left New York that the guns, the ammunition, and the men were to be so combined on their way to Cuba as to make a military descent upon the island; and that if that knowledge came to him after he reached Montauk Point or on his way to Cuba, then it is their duty to acquit.

The Court: I think I did state that substantially, perhaps in a little different form. I have no hesitation in stating substantially the same thing again, if I did not so state. I think I said unless the jury were satisfied that the captain within the Southern district of New York had reason to believe, either knew or had reason to believe, that these arms and men were to be combined so as to form a military enterprise at the time they landed in Cuba, that he should be acquitted.

82 F.—39

Mr. Tracy: The criticism I have to your honor's charge, and the only criticism in that respect, is that you leave out that they must be satisfied from facts proved, not imaginary speculation.

The Court: Undoubtedly.

Mr. Tracy: That the facts proved must satisfy them beyond a reasonable doubt that he did know.

The Court: Gentlemen, that goes without saying. You are not to imagine a person guilty, or convict him because you might fancy he may be. What you are authorized to go upon is the evidence in the case as a whole, and the inferences that as reasonable men you are warranted in drawing from that evidence. It is not speculation, not possibilities, not imaginings, not mere surmises of any kind; but those rational conclusions which you cannot help drawing as reasonable men from the facts proved. That is what I mean. You take the facts proved, and from them you are bound to draw such reasonable inferences as flow from them, because the facts proved are evidence of knowledge or intent so far as they reasonably go. It excludes all mere surmise, mere imagining, mere fancy; but it includes all those rational conclusions which as reasonable men you cannot help drawing. With these comments and that explanation, I say to you that the evidence must show, and show in that way, that he had that knowledge, or that means of knowledge or that reasonable belief.

Mr. Reubens: We except separately to your honor's refusal to charge each of our requests as put and without modification.

The Court: Yes.

Mr. Tracy: And we also except to the modifications as made. I desire also to except to that part of your honor's charge in which you submit to the jury to find whether or not Nunez did any act in the city of New York towards setting on foot or preparing for the transportation of this expedition. I except to that on the ground that your honor, having charged that what he did at Montauk Point would not constitute him guilty, that there is no evidence of any fact proved, no evidence of any act committed by him in the city of New York that tended in any way to set this expedition on foot, and therefore there is nothing on which the jury could find such a fact as that.

Mr. Macfarlane: I did not understand your honor to charge the jury that what he did at Montauk Point would not be sufficient to find him guilty if they found that he did it with intent to further an expedition which he had aided and abetted in when he left New York.

The Court: If both counsel so far misunderstood what the court intended to say, I think possibly the jury may have misunderstood equally, and that I had better state once more what I did intend to say. What I intended to state to the jury was this: That the act of Nunez in giving $100, if you should believe the evidence upon the government's side that he did give $100 to the captain for the purpose of quieting the men—I say that act alone would not constitute any ground for finding him guilty, for the reason that the act was done outside the district of New York, which is the district where the

indictment charges the offense to have been committed. If that was the only thing in the case, that act alone would not support the indictment by itself. And so with what took place in Jacksonville. I said, however, that as I understood the government's contention, its claim was not for those acts as independent acts, but that they were very strong evidence that he was the father of this expedition, that he was the manager or principal who was setting on foot the enterprise, attending to it, managing it, carrying it out. It is for you to judge of the strength of that testimony. If you believe it in the shape in which it was presented to you by counsel for the government, it still remains for you to consider what conclusions that warrants, how far it is sufficient to sustain the claim of the government that he was the manager of this expedition. It is only as evidence as upon that question that I consider it has any bearing upon this case.

Mr. Tracy: I desire to except to that part of your honor's charge even as modified. I submit that does not warrant any such conclusion.

The Court: I leave that to the jury. I express no opinion as to its weight or force.

The jury then retired, and having failed to agree they were subsequently discharged.